**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:

                                                 **Chapter 7**

**CHRISTIAN CLAVELL,**                           **Case No. 15-12343 (MEW)**

                        **Debtor.**
-----------------------------------------------------------------x
**CHRISTIAN CLAVELL,**
                             **Plaintiff,**

       – v –                                **Adv. Pro. No. 16-01181 (MEW)**

**UNITED STATES DEPARTMENT OF**
**EDUCATION and NAVIENT,**

                       **Defendants.**
-----------------------------------------------------------------x

<u>**MEMORANDUM DECISION FOLLOWING TRIAL**</u>

       Before the Court is an adversary proceeding filed by the chapter 7 debtor, Christian

Clavell, seeking a determination that more than $96,000 of student loan debt that he owes to the

Department of Education (the "DOE") should be discharged.  The outstanding debt is the

product of a consolidation of other student loans and is evidenced by a promissory note dated

February 6, 2013 (the "Consolidated Note").  Navient is named as a defendant in the Complaint

but it is not a party to the promissory note, and Mr. Clavell and the DOE apparently agree that

Navient was not a necessary or proper party to the litigation.

       Mr. Clavell argues that he and/or his dependents would suffer undue hardship if his

obligations under the Consolidated Note are not discharged.  *See* 11 U.S.C. § 523(a)(8).  The

DOE opposes the requested relief.  It argues primarily that Mr. Clavell can afford to make the

minimum payments that would be due under the "Revised Pay as you Earn" or "REPAYE"

option that is available under the terms of the Consolidated Note.  The most recent calculations

submitted to the Court show that such payments would start at $492 per month.  DOE also

argues that Mr. Clavell should be able to make the payments that would be due even under a normalized repayment schedule that is not income-based (which would be approximately $629 per month over a 30 year repayment period or $670 per month over a 25-year repayment period) and that Mr. Clavell has failed to satisfy other requirements for a discharge of his student loans.

No issue has been raised as to the nature of the underlying debts, or the computation of the amounts currently owed, or the amounts that Mr. Clavell would be required to pay under the different payment options that are available under the Note, and the parties have made supplemental submissions to clarify and to update those calculations. While the parties agree as to what the various payment options would require, they disagree strongly about Mr. Clavell's available income and expenses. DOE also contends that Mr. Clavell has not made sufficient efforts to economize and that he has not made good faith efforts to repay his loans.

On May 20, 2019, this Court held a trial on the merits. At the conclusion of the trial the Court ordered the parties to make additional submissions that itemized the income and expense items about which they agreed and disagreed. Those submissions were filed on July 8, 2019. The DOE then filed a motion to strike certain exhibits that had been attached to Mr. Clavell's post-trial submission. *See* Mot. to Strike [ECF No. 40]. By Order dated October 2, 2019 [ECF No. 42] the Court directed the parties to submit further information about the REPAYE calculations and also to state their positions as to whether the decision before this Court must be made on an "all-or-nothing" basis (i.e., either a full discharge or no discharge at all), or if they believe the Court has authority to grant a "partial discharge" if the facts were to warrant such an outcome. The parties filed those further submissions on October 22, 2019 [ECF Nos. 43 and 44]. By Order dated November 22, 2019 [ECF No. 45], the Court directed the parties to update their prior calculations as to the payments that would be required under the available payment options,

to answer additional questions about the REPAYE program, and (in the case of the DOE) to provide a more definitive statement as to whether the DOE contends that the Court has the power to grant a partial discharge of Mr. Clavell's student loan debts.  The parties made such submissions on December 9, 2019 [ECF Nos. 46 and 47].  Among other things, the parties have agreed that the Court has the power to grant a partial discharge, though the DOE contends that such relief is not warranted.

### **Background and Facts**

The following factual findings are based on the parties' stipulated facts and the evidence and testimony at trial, as supplemented by the post-trial submissions that the Court has received.

Mr. Clavell was 35 years old at the time of trial.  He is employed in the sales group at Liberty Coca-Cola company, which is a privately-owned distributor of Coca-Cola products.  He worked at other Coca-Cola related entities for 12 years before beginning his employment with Liberty Coca-Cola.  Mr. Clavell lives in his childhood home in the South Bronx with his elderly grandfather who is in his late 80s.

Mr. Clavell is the first male in his family to attend college.  His family moved to the U.S. mainland from a relatively poor part of Puerto Rico.  He obtained his bachelor's and master's degrees while working full-time at one of the predecessor entities to Liberty Coca-Cola.

Mr. Clavell first obtained student loans to help him finance the cost of earning an associate degree from Bronx Community College and then a bachelor's degree from the University of Phoenix.  Thereafter, Mr. Clavell decided that he would like to pursue a possible career in law enforcement.  To that end he obtained additional loans to finance the costs of obtaining a master's degree from Long Island University in Homeland Security Management Studies.  Mr. Clavell received his master's degree in 2012.  Mr. Clavell testified credibly that he

made diligent efforts to obtain employment in various law enforcement fields but that he was unable to do so. He has instead worked in sales positions, first for "Coca-Cola North America" or "Coca-Cola USA" and then, from and after November 2017, for Liberty Coca-Cola.

Mr. Clavell's son was born following the completion of Mr. Clavell's master's program. His son was born prematurely (at about 27 weeks, or 2 months premature) and spent over two months in the neo-natal intensive care unit after his birth. Mr. Clavell is not married to his son's mother, and she was not employed when she gave birth. Mr. Clavell covered all of the out-of-pocket medical expenses associated with his son's hospitalization along with part of the mother's living expenses. Shortly after his son was born, Mr. Clavell contacted his student loan servicers to inform them of these developments and to tell them that he could not afford to make the minimum payments due on the loans. The loan servicers then agreed to defer the payments.

When his son was a few months old, in or around February 2013, Mr. Clavell consolidated his student loans through the DOE and executed the Consolidated Note in the amount of $66,641.96. The Consolidated Note provides that interest accrues at a fixed rate of 6.75%. It also provides that unpaid interest is capitalized, so that it becomes part of the principal and part of the obligation on which additional interest accruals are calculated, but apparently that capitalization of interest would be waived if Mr. Clavell were to participate in the REPAYE program. The parties stipulated that as of March 21, 2019 the outstanding balance of the loans, including interest, was $93,332.25. The parties agreed in their supplemental submissions on December 9, 2019 that the balance had increased to $96,485.09 due to interest accruals.

In 2013 Mr. Clavell also faced a legal battle concerning custody issues. As noted above, he was not married to his son's mother—whom he dated for a short while—and the mother sought to obtain full custody of their son. The legal fees he incurred in the ensuing year-long

legal battle were so significant that he had to borrow against his 401(k) plan to pay them. The outcome of the custody battle was the entry of an order that required Mr. Clavell to make biweekly child support payments. Initially, these payments included an arrearage component and were fixed at $670, but they are now $438, for a total annual expense of $11,388 (the equivalent of a monthly expense of $949). Mr. Clavell testified that he often pays additional sums to meet his son's needs, in amounts that are not regular or easy to predict.

Mr. Clavell also faced mounting credit card bills in addition to the outstanding legal fees, child support awards and other payments he had made to assist his son's mother. He did not make any payments towards his student loans in the first year or so of his son's life, and he testified credibly that he was unable to do so in light of his other expenses. To date, he has not made any payments towards the consolidated DOE loans. However, no default has been declared, and the consolidated loan apparently has been in forbearance during its entire tenure.

Mr. Clavell's son is now six years old. He is enrolled in a New York Department of Education individualized education plan (otherwise known as an "IEP") as a result of his special needs. Mr. Clavell testified that his son has "trouble with cognition," that he suffers from speech issues and that there have been some initial concerns that he may suffer from other conditions, though no formal diagnosis of any such other condition has been made. As part of the IEP, Mr. Clavell's son receives help from a behavioral specialist who assists him in skills in which he is developmentally behind. Mr. Clavell's son also suffers from severe asthma (for which a minimum of two treatments is required per day) as well as eczema and dental issues. His son's mother, who has the final word on parenting decisions, would like to enroll Mr. Clavell's son in a private school since she believes the IEP placement does not provide him with the individualized attention that he needs.

5

Mr. Clavell himself also suffers from medical issues.  He suffered an eye injury when he was younger and has had several eye surgeries.  He is supposed to take special eye drops but he has not been doing so because the eye drops cost approximately $60 to $70 per month, which Mr. Clavell believes he cannot afford.

Mr. Clavell has considered part-time employment in addition to his current full-time job, including driving for car services such as Uber or Lyft.  Those options, however, are foreclosed by his eye conditions and also by a concern that he would not be able to care for his son when he has custody of him.

The parties have disagreed about some items as discussed more fully below, but they have stipulated that Mr. Clavell's wages for the year 2018 were $71,594 and that his current projected wages are $77,817.  The primary issues for the Court to resolve are the parties' disagreements as to whether this amount includes all of Mr. Clavell's income (or likely income), and as to the expenses that should be deducted from his income in determining whether he is able to repay his student loan debts without undue hardship.

### The *Brunner* Standard

Section 523(a)(8) of the Bankruptcy Code provides that student loan obligations normally are not discharged in a bankruptcy case.  An exception is available if the failure to discharge the student loan obligations would result in an "undue hardship."  "Because any debtor in bankruptcy usually has significant financial problems, a finding of undue hardship will not be based simply on the debtor's difficulty in making payments."  *Williams v. N.Y. State Higher Educ. Servs. Corp. (In re Williams)*, 296 B.R. 298, 302 (S.D.N.Y. 2003), *aff'd*, 84 F. App'x 158 (2d Cir. 2004).  The Second Circuit Court of Appeals has held that "undue hardship" can be found only where the following three showings are made:

6

(1)    that the debtor cannot maintain, based on current income and

expenses, a "minimal" standard of living for the debtor and the debtor's

dependents if forced to repay the loans;

(2)    that additional circumstances exist indicating that this current

state of affairs is likely to persist for a significant portion of the repayment

period; and

(3)    that the debtor has made good faith efforts to repay the loans.

*Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987).  A debtor

must establish each of *Brunner's* three prongs by a preponderance of the evidence in order to be

entitled to a student loan discharge.  *See In re Traversa*, 444 F. App'x 472, 474 (2d Cir. 2011).

There have been many proposals to modify section 523(a)(8) and/or to modify the

*Brunner* factors.  *See, e.g.,* Am. Bankr. Inst., *Final Report of the ABI Commission on Consumer

Bankruptcy* 1-13 (2019).  There have also been suggestions that the *Brunner* tests have often

been applied in a way that is overly harsh and that is not consistent with *Brunner* itself.  *See, e.g.,*

*Rosenberg v. N.Y. State Higher Educ. Servs. Corp. (In re Rosenberg)*, No. 18-35379 (CGM),

2020 Bankr. LEXIS 73, at *6-7 (Bankr. S.D.N.Y. Jan. 7, 2020) (referring to "retributive dicta" in

prior decisions that have generated "a quasi-standard of mythic proportions" that is considerably

harsher than the standard actually set forth in *Brunner*).  *Brunner* is the law of this Circuit and it

governs Mr. Clavell's case, though I agree with Chief Judge Morris that the *Brunner* test should

be applied "as it was originally intended."  *Id*.

## The Relevance of the REPAYE Calculations

The first thing that one must do in order to determine whether Mr. Clavell can afford to

repay his student loans without undue hardship is to identify what his loan payments would be.

7

A number of payment options are available with respect to the Consolidated Note. Based on the amounts outstanding as of December 9, 2019, the "standard" repayment plan – one that would cover periodic interest charges while steadily reducing the outstanding principal -- would require payments of $629 per month for 360 months (or 30 years). Repayment over a 25-year period would require monthly payments of $670.

The DOE contends Mr. Clavell is also eligible for the REPAYE plan, which is one of the DOE's income-based repayment programs. *See* Joint Pretrial Order 3 [ECF No. 29]. The REPAYE plan permits an eligible borrower to make payments that are limited to ten percent (10%) of the amount that is deemed under the applicable regulations to constitute the borrower's discretionary income. For purposes of the REPAYE calculations a borrower's discretionary income is deemed to be equal to the difference between the borrower's adjusted gross income (as reported on tax returns) and 150% of the U.S. Department of Health and Human Services' Poverty Guideline amount for the borrower's family size and state of residence. *See* Joint Pretrial Order ¶¶ 14-17 [ECF No. 29]; 34 C.F.R. § 685.209(c). An eligible borrower must obtain an annual recertification of income, and the required monthly payment may be adjusted each year based on changes in income and/or changes in poverty guidelines. *Id.*

If a REPAYE payment is not sufficient to pay accrued interest then one-half of any unpaid interest is added to the outstanding balance, except that during the first three years of the REPAYE period any unpaid interest is forgiven with respect to the "subsidized" portion of a student loan. Any default during the REPAYE period (including any failure to complete an annual re-certification of eligibility) would reinstate the full debt and the higher payment obligations, and apparently would result in the capitalization of interest accruals as well. A debtor who complies fully with the REPAYE program terms is eligible to have any unpaid

balance forgiven at the end of the REPAYE period.  Such forgiveness constitutes a taxable

receipt of income if the debtor is solvent at the time of the forgiveness.

At trial, the parties stipulated that payments under the REPAYE program would be $418

per month.  However, that calculation was based on the assumption that Mr. Clavell would have

an adjusted gross income of $68,373.  In their post-trial submissions the parties agreed that Mr.

Clavell's adjusted gross income will likely be $77,817.84.  The Court asked the parties to

recalculate the REPAYE obligations based on the revised income assumption, and the parties

agreed that the REPAYE payments would initially be $492 per month, or $436 per month if Mr.

Clavell were eligible to claim his son as a dependent.

There are two points that the Court must consider with respect to the REPAYE option.

First, at times there were suggestions in the parties' presentations and submissions that

the REPAYE calculation methodology is itself a reasonable way to calculate the amounts that a

debtor can actually afford to pay, because the payments are tied to a percentage of income above

poverty levels.  At trial, however, the DOE confirmed that the REPAYE calculations are based

on the adjusted gross income that a debtor reports on his or her tax returns, with no adjustment

for child support payments and other similar expenses that are not deducted from adjusted gross

income for tax purposes.  Trial Tr. 163:2-8, May 20, 2019; *see also* 34 C.F.R. § 685.209(c).  The

DOE also confirmed at the close of the trial (based on the parties' initial calculations) that a

single person with adjusted gross income of $68,373, but with no children or other unusual

expenses, would be deemed under the REPAYE program to be able to afford student loan

repayments of $418 per month.  As noted above, the same calculations suggest that a single

person with adjusted gross income of $77,817.84 would be able to afford a monthly payment of

$492.  But Mr. Clavell's child support payments ($949 per month) are not deductible from his

taxable income and they do not reduce his reported "adjusted gross income" for tax purposes.  If the REPAYE calculations show that an individual with no child support obligations can only reasonably afford to repay $492 per month, then a person who has the same income but who also has a child support obligation of $949 per month presumably is not capable of paying anything. Yet the REPAYE calculations would still require a $492 monthly payment.

The Court asked the DOE to explain why its own REPAYE calculations do not show that Mr. Clavell is unable to repay his student loans.  In its post-trial submission, the DOE merely stated that if Mr. Clavell were entitled to claim his son as a dependent (meaning that he would have to provide more than half of his son's support) then his calculated monthly payment under the REPAYE program would be reduced from $492 to $436.  This reduction of $56, however, is far less than Mr. Clavell's actual monthly child support payment of $949.

The willingness of DOE to make the REPAYE option available is beneficial to many people with student loan debts.  Its significance generally as a potential source of relief to debtors is important.  But one should not think that the REPAYE calculations themselves are a reliable indication of what a particular debtor actually can afford to pay.  The calculations are too mechanical, and far too unresponsive to a particular debtor's actual circumstances, to permit them to be used in this way.  It is possible that a debtor may actually be able to afford the payments due under a REPAYE plan, but that is not necessarily the case, and the truth can only be determined by looking at a debtor's actual resources and actual likely expenses.

Second, the REPAYE program – despite its name – is not necessarily a "repayment" plan.  A debtor's income determines the amounts to be paid under the REPAYE program, and those amounts may or may not be sufficient to result in a repayment of the underlying loans.  In many cases a REPAYE plan merely defers payments and allows debts to accumulate, with the

possibility of an ultimate forgiveness but without a full repayment or in some cases even a partial

repayment.  34 C.F.R. § 685.209(c)(2)(ii)(C), (c)(3)(i).  *Brunner* calls for a court to determine

whether a debtor can afford to "repay" student loans.  Many courts have held that if the

REPAYE program will likely just result in a deferral of payments and a likely forgiveness of the

debt in the future (with a potential income tax liability upon forgiveness) then the mere fact that

the REPAYE payments are low, or in some cases even zero, does not really mean that a debtor

can afford to "repay" the underlying loans.  *See, e.g., Hill v. Educ. Credit Mgmt. Corp. (In re

Hill)*, 598 B.R. 907, 917 (Bankr. N.D. Ga. 2019) (rejecting the suggestion that a zero REPAYE

payment showed that student loans did not need to be discharged, and holding that the REPAYE

calculations proved that the debtor "has no discretionary income to expend on student loan

payments"); *Nightingale v. N.C. State Educ. Assistance Auth. (In re Nightingale)*, 529 B.R. 641,

649-50 (Bankr. M.D.N.C. 2015) ("accepting the concept of a zero payment as constituting

'repayment' . . . effectively eliminates the hardship discharge provision for student loans for those

most likely to be entitled to it"); *Brooks v. Educ. Credit Mgmt. Corp. (In re Brooks)*, 406 B.R.

382, 393 (Bankr. D. Minn. 2009) ("the inquiry is to the debtor's ability to repay the loan, not

simply to make payments.")

I agree that a low REPAYE payment (based on low income) may just show that a debtor

actually cannot afford to "repay" a student loan at all.  In this case, however, the parties have

agreed in their supplemental submissions that if Mr. Clavell were to make the payments required

under the REPAYE program it would likely result in a full payment of the applicable student

loan debts.  The Court therefore must consider whether Mr. Clavell can afford to make the

REPAYE payments while still maintaining a minimal standard of living.

I.    **Mr. Clavell's Ability to Maintain a Minimal Standard of Living Without a Discharge**

Section 523(a)(8) makes clear that in considering whether an undue hardship exists a court should consider not only the impact of the continuing debt on the debtor but also the impact on the debtor's dependents. 11 U.S.C. § 523(a)(8). In addition, a "minimal standard of living" does not require that the debtor live in poverty. *See Doe v. Educ. Credit Mgmt. Corp. (In re Doe)*, 325 B.R. 69, 73-74 (Bankr. S.D.N.Y. 2005) (vacated after settlement) (holding that a debtor "need not live in abject poverty to qualify for a discharge"); *Bene v. Educ. Credit Mgmt. Corp. (In re Bene)*, 474 B.R. 56, 68–69 (Bankr. W.D.N.Y. 2012) ("Clearly the Second Circuit did not equate 'minimal standard of living' with 'poverty.' The Circuit unequivocally held that committing a debtor 'to a life of *poverty*' for an extended time into the 'ten year loan repayment period' would constitute a hardship that is 'undue.'"); *Kelly v. Sallie Mae Servicing (In re Kelly)*, 351 B.R. 45, 53 (Bankr. E.D.N.Y. 2006) (ruling that while the "minimum standard of living test requires more than a showing of tight finances," it "does not require the [d]ebtor to demonstrate that repayment of the loan would cause [her] ... to live at or below the poverty line.") (citations omitted); *Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 905-07 (D.S.C. 1995) (rejecting the contention that the bankruptcy court erred because it discharged most of the student loan debt of a debtor who earned $40,000 a year above the federal poverty level); *Collier on Bankruptcy* ¶ 523.14 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("[t]he federal poverty level is too strict a standard for measuring whether the debtor's standard of living is at a minimal level and should not be employed for that purpose.")

While a "minimal standard of living" does not mean living at or near the poverty level, there is no definitive guide as to just what it does mean. "At bottom, the Bankruptcy Code requires bankruptcy courts to decide how much personal sacrifice society expects" from debtors

who have unpaid student loans. *Id.* The reported decisions reflect many different views as to this basic question. Courts have expressed different opinions as to whether various typical expenses of modern life (such as life insurance premiums, retirement plan contributions, cable TV contracts, mobile phone contracts, car lease payments, expenses for eating-out, gym memberships and occasional recreational activities) are part of maintaining a "minimal" standard of living or instead are just luxuries that a student loan obligor must forego.

The Court in *Ivory v. U.S. Dep't of Educ. (In re Ivory)*, 269 B.R. 890 (N.D. Ala. 2001) provided a useful framework for understanding what is required for a debtor to sustain a "minimal standard of living:"

> 1.  People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.
>
> 2.  People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer. They need telephones to communicate.
>
> 3.  People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.
>
> 4.  People need vehicles to go to work, to go to stores, and to go to doctors. They must have insurance for and the ability to buy tags for those vehicles. They must pay for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.
>
> 5.  People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.
>
> 6.  People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.

*Id.* at 899.

I agree that a debtor is not required under *Brunner* to forego necessary and reasonable expenses, such as healthcare expenses, food, and a modest amount of recreation and entertainment that is incident to modern life. *See, e.g.*, *Zook v. Edfinancial Corp. (In re Zook)*, Adv. No. 05–10019, 2009 WL 512436, at *8 (Bankr. D.C. Feb. 27, 2009) ("A debtor is entitled under the minimal standard of living test to incur some modicum of expenditures on telephone and entertainment."); *McLaney v. Ky. Higher Educ. Assistance Auth. (In re McLaney)*, 375 B.R. 666, 674 (M.D. Ala. 2007) ("Even under the minimal standard of living test, '[p]eople must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.'")  One must remember, after all, that the point at which a debtor experiences "undue hardship" – not abject privation – is the point at which a discharge is supposed to be available under the statute.

## A.    Findings as to Mr. Clavell's Income

The following table shows the parties' contentions about Mr. Clavell's income.  It highlights the categories for which items are in dispute and sets forth the Court's findings as to each item.  The Court's findings are then explained more fully below.

| Income | Per Clavell | Per DOE | Findings |
|---|---|---|---|
| Average Monthly Gross Earnings | $ 6,484.82 | $ 6,484.82 | $6,484.82 |
| **Tax Refunds (per month)** | **$0** | **$376.00** | **$0** |
| Total Income | **$ 6,484.82** | **$ 6,860.82** | **$6,484.82** |
| *Withholdings & Payroll Deductions* | | | |
| Taxes, SS, Medicare | ($1,828.37) | ($1,828.37) | ($1,828.37) |
| **401(k) Loan Repayment (Loan 1)** | **($208.58)** | **$0** | **$0** |
| **401(k) Loan Repayment (Loan 2)** | **($83.71)** | **$0** | **$0** |
| **Child Support** | **($949.00)** | **($912.50)** | **($949.00)** |
| Medical, Dental, Vision Plans | ($227.63) | ($227.63) | ($227.63) |
| **401K & Roth 401K** | **($121.56)** | **$0** | **($121.56)** |
| Disability & Life Insurance | ($32.53) | ($32.53) | ($32.53) |
| *Total Withholdings and Deductions* | ($3,451.38) | ($3,001.03) | ($3,159.09) |
| *Total Monthly Take-Home Pay* | $3,033.44 | $3,859.79 | $3,325.73 |

**Average Monthly Gross Earnings**.  At trial there were disputes about Mr. Clavell's potential bonuses and vehicle expense reimbursements, but after trial the parties agreed that Mr. Clavell's likely monthly gross income (inclusive of those items) will be $6,484.82 per month, and the Court will accept that agreed figure.

**Tax Refunds**.  If tax withholdings are considered in computing a debtor's available resources for loan repayments and other expenses, then it makes sense that likely tax refunds (or likely tax payments in the event of under-withholding) should also be taken into consideration. Otherwise, a debtor's available funds would be under-estimated (or over-estimated) due to an inaccuracy in withholding rates.  Likely tax refunds therefore may be considered in determining a debtor's ability to repay student loans.  *See, e.g.*, *Miller v. Sallie Mae, Inc. (In re Miller)*, 409 B.R. 299, 305 (Bankr. E.D. Pa. 2009).

The DOE argues that Mr. Clavell received federal and state income tax refunds for the years 2014 through 2017 that averaged just under $4,500 per year.  DOE argues that the Court therefore should conclude that Mr. Clavell similarly will receive tax refunds of $4,500 per year for the foreseeable future.  However, tax rates and deductible items changed considerably beginning with the tax year 2018.  Even a cursory examination of Mr. Clavell's tax returns for the years in which he received refunds (2014-2017) shows, for example, that most of the refunds that he received were attributable to deductions that he was able to take for unreimbursed vehicle expenses associated with his work.  There is no suggestion that similar deductions are still available to him.  Mr. Clavell's actual tax return for 2018 shows that he took the newly available standard deduction of $12,000 and no other deductions.

The tax withholding tables also changed considerably when the 2018 tax law changes went into effect.  Many Americans who were accustomed to tax refunds found, to their dismay,

that under the 2018 withholding tables and new tax rules their refunds would be less than

expected or that they actually owed additional payments.  *See, e.g.,* Heather Long, *Millions of*

*Americans Could Be Stunned As Their Tax Refunds Shrink*, Wash. Post (Feb. 10, 2019, 6:08

PM), https://www.washingtonpost.com/business/2019/02/10/millions-americans-could-be-

stunned-their-tax-refunds-shrink/.  Mr. Clavell's own 2018 tax returns were offered into

evidence and they showed an underpayment of taxes in 2018, though the 2018 taxes were

affected by a one-time early pension distribution that Mr. Clavell received.

The DOE alleges (in essence) that Mr. Clavell's taxes are currently being "over-

withheld," but I note that the DOE offered Mr. Clavell's 2019 pay stubs into evidence, and it

could have calculated Mr. Clavell's likely tax liabilities and compared them to his likely

withholdings if it wished to support that contention.  However, the DOE offered no such

evidence.  Instead, the DOE based its contention solely on what happened in prior tax years, at a

time when withholding rates and tax computations were governed by different rules.

Mr. Clavell offered credible evidence of his likely future income.  There is no evidence in

the record that Mr. Clavell's current tax withholdings are at anything other than the levels

prescribed by federal, state and city taxing authorities.  No other evidence was offered to support

the suggestion that the current withholdings are likely to generate refunds.  The Court has

conducted its own review of the current tax withholding levels, and the Court's own review did

not show any reason to believe that tax refunds are likely.  The Court therefore finds that the

DOE's proposed adjustment for tax refunds is not supported by the evidence and is not proper.

**401(k) Loan Repayments.**  Mr. Clavell borrowed money from his 401(k) account to

enable him to cover some expenses.  The DOE disputes that Mr. Clavell's repayment of the

401(k) loans is a reasonable expense.  Mr. Clavell argued in response that he must repay the loans in order to avoid adverse tax consequences and penalties.

The DOE argues that 401(k) loan repayments are not true "debts," citing the decision in *In re Villarie*, 648 F.2d 810, 811 (2d Cir. 1981).  The DOE also argues that 401(k) loan repayments are not entitled to priority treatment in bankruptcy cases, citing the decision in *Anes v. Dehart III (In re Anes)*, 195 F.3d 177, 180-81 (3d Cir. 1999).  But Mr. Clavell has not argued that he has no choice but to repay the 401(k) loan, and he has not argued that the loan repayment is an obligation that is entitled to legal priority.  He argues that the repayment is a reasonable expense (not a required expense) and that it should be considered part of the maintenance of a "minimal" standard of living.

The Court takes judicial notice of the fact that a failure by Mr. Clavell to make the 401(k) loan repayments would mean that the loans would be treated as premature 401(k) distributions, which would transform the principal amounts of the loans into taxable income and would also result in the imposition of a 10% early withdrawal penalty.[1]  *See* 26 U.S.C. § 72(t)(2)(A) (provision of U.S. Tax Code applying a 10% additional tax on early distributions from qualified retirement plans); *Retirement Topics – Plan Loans,* U.S. Internal Revenue Serv. (June 18, 2019), https://www.irs.gov/retirement-plans/plan-participant-employee/retirement-topics-loans ("If the [401(k)] loan repayments are not made at least quarterly, the remaining balance is treated as a

---

[1]    It is well-settled that courts can take judicial notice of IRS guidance.  *See Anderson v. Greene*, No. 14 CIV 10249 (KPF), 2016 WL 4367960, at *19 n.13 (S.D.N.Y. Aug. 10, 2016), *aff'd*, 774 F. App'x 694 (2d Cir. 2019), *cert denied*, No. 19-6012, 2019 WL 6257468 (Nov. 25, 2019) (taking judicial notice of IRS 2011 tax calendar);  *Kaff v. Nationwide Credit, Inc.*, No. 13-CV-5413 (SLT) (VVP), 2015 WL 12660327, at *3 n.2 (E.D.N.Y. Mar. 31, 2015) (taking judicial notice of IRS tax form under Federal Rule of Evidence 201); *In re Draiman*, 450 B.R. 777, 802 n.16 (Bankr. N.D. Ill. 2011) (taking judicial notice of IRS instructions for tax form.)

distribution that is subject to income tax and may be subject to the 10% early distribution tax.")
Those additional tax liabilities would significantly (though not completely) offset any savings
that would be obtained by foregoing the loan repayments.  From that perspective, it would make
little sense for Mr. Clavell to forego the loan repayments.

On the other hand, the evidence submitted to the Court shows that the first of the two
401(k) loans has already been repaid and that payroll deductions for that loan stopped in April
2019.  It is therefore plain that no future loan repayment expense should be forecasted as to that
loan.  As of June 14, 2019, the balance of the second loan was $825.84.  The evidence shows that
Mr. Clavell is repaying that loan at the rate of approximately $83 per month, which means that
the loan should be repaid by approximately April 2020.  While the few remaining payments that
are due with respect to that loan may be reasonable and appropriate, this particular item is only a
very short-term limit on the amounts Mr. Clavell can afford to dedicate to student loan
repayments.  The Court therefore will disregard these repayments in assessing Mr. Clavell's
ability to make student loan payments.

**Child Support Deductions.**  Mr. Clavell pays $219 each week in child support, which
equates to payments of $949 per month ($219 times 52 divided by 12).  The DOE stipulated to
this amount in the Joint Pretrial Order.  *See* Joint Pretrial Order 2 [ECF No. 29].  In Appendix A
to its post-trial brief [ECF No. 37-1], however, DOE submitted a revised calculation.  It listed the
child support payments that had been documented at $219 per week but suggested that there had
been no such deduction for the pay period ending January 19, 2019.  As a result, the DOE's
calculated six-month total was $5,475 rather than $5,694 – leading to a lower monthly average.

The Court notes that the payroll slips that were offered into evidence at trial included
some that were labeled "off-cycle" reports (which did not list child support deductions) and

others that were listed as "regular payroll" reports (which did list the child support deductions).

For some unexplained reason the only report in evidence as to the pay period ended January 19,

2019 is the "off-cycle" report.  The DOE calculation – which presumes the payment was not

made at all – appears to be based on the fact that the "regular payroll" form is missing and only

the "off-cycle" report is in evidence.  No reason was offered as to why the payment would not

have been made.  To the contrary: the evidence suggests that the child support deductions are

mandated by the state courts and are automatically deducted from Mr. Clavell's paychecks.

It is plain from the record that child support payments are being withheld at the rate of

$219 per week, which verifies the monthly sum of $949 to which the DOE previously stipulated

in the Joint Pretrial Order, and the Court finds that $949 per month is the actual appropriate

deduction for child support.

Based on the foregoing, the Court concludes that Mr. Clavell's monthly take-home pay,

before consideration of other expenses, is likely to be $3,242.02 per month, which will increase

to $3,325.73 in approximately April 2020 after his remaining 401(k) loan is repaid.

**Ongoing 401(k) Contributions**.  The DOE argues that Mr. Clavell should forego any

further contributions towards his 401(k) plans.  Those contributions currently are $121.56 per

month and are divided equally between contributions to a standard 401(k) plan and to a separate

Roth 401(k) plan.  Mr. Clavell testified credibly that he contributes the bare minimum that

permits him to retain his participation in the 401(k) plans.  Mr. Clavell's pay stubs show that his

employer makes a partial matching contribution.  *See generally* Def.'s Ex. N.

The DOE urges the Court to hold that 401(k) contributions are "luxuries" and are not

reasonable expenses.  Some courts have adopted this view.  *See, e.g.*, *Woody v. U.S. Dep't of

Justice (In re Woody)*, 494 F.3d 939, 952 (10th Cir. 2007); *Perkins v. Pa. Higher Educ.*

*Assistance Agency (In re Perkins)*, 318 B.R. 300, 306 (Bankr. M.D.N.C. 2004).  Other courts, however, have held that modest retirement contributions can be reasonable expenses and that there is no *per se* rule that such contributions should be disregarded in determining whether a debtor can repay student loans without undue hardship.  *See Marcotte v. Brazos Higher Educ. Serv. Corp. (In re Marcotte)*, 455 B.R. 460, 469-70 (Bankr. D.S.C. 2011) (noting that retirement contributions may be justified under certain factual circumstances); *Craig v. Educ. Credit Mgmt. Corp. (In re Craig)*, 579 F.3d 1040, 1046 (9th Cir. 2009) (holding there is no "*per se*" rule that retirement contributions are automatically unreasonable); *McDowell v. Educ. Credit Mgmt. Corp. (In re McDowell)*, 549 B.R. 744, 767 n.33 (Bankr. D. Idaho 2016) (finding that the debtor's modest contributions to her retirement fund reasonable under the circumstances where she was a single mother of two dependents); *Allen v. Am. Educ. Serv. (In re Allen)*, 329 B.R. 544, 551-52 (Bankr. W.D. Pa. 2005) (finding that debtor's payroll deduction for retirement contributions was reasonable and holding that the deduction was allowable under an "undue hardship" analysis.)

I disagree with the DOE's contention that modest 401(k) contributions of the kind at issue here are "luxury" items.  One of the financial obligations of a responsible adult is to make reasonable provisions for the future, both for the adult's own good and for the good of his or her family.  In measuring what a person reasonably needs in order to maintain a minimal standard of living I believe it is proper to allow modest 401(k) contributions to be made.  Requiring a debtor to forego making reasonable provisions for his and his family's future living expenses would itself be an "undue hardship," even if it would not immediately deprive the debtor of food or shelter.  I note that the DOE agrees that modest expenses for life insurance and disability insurance are proper and reasonable, because the contingencies and uncertainties of life simply

20

need to be addressed.  I conclude that modest retirement contributions of the kind at issue here should be regarded in the same light.

### B.    Findings as to Mr. Clavell's Expenses

At trial, the DOE sought to portray Mr. Clavell as not credible because the estimates he provided for expenses changed over time.  In particular, the DOE contends that the figures he provided during and after trial differ from those included in the initial petition he filed in August 2015 and those he outlined in his responses to interrogatories provided in 2017.  As I noted during trial, what matters is Mr. Clavell's current state of affairs (*Brunner's* first prong asks whether the debtor can maintain a minimal standard of living based on *current* income and expenses).  It also became quite plain to me during trial that some of Mr. Clavell's expense estimates were obviously deficient.  I therefore reject the DOE's suggestion that I should disregard the evidence offered at trial solely because it differs from some earlier estimates.

In addition, and consistent with the case law, I will apply my "'common sense knowledge gained from ordinary observations in daily life and general experience to determine whether [the] [d]ebtor's expenses are reasonable and necessary' to maintaining minimal standard of living."  *Crawley v. Educ. Credit Mgmt. Corp. (In re Crawley)*, 460 B.R. 421, 437 n.16 (Bankr. E.D. Pa. 2011) (citing *Douglas v. Educ. Credit Mgmt. Corp (In re Douglas)*, 366 B.R. 241, 253 (Bankr. M.D. Ga. 2007); *see also United States v. Cavera*, 550 F.3d 180, 205 (2d Cir. 2008) (noting that "the factfinder—whether judge or jury—[may] draw on common sense and experience in making any determination.")

The table below shows Mr. Clavell's various expense categories and each party's estimates for those categories, again with the points of disagreement highlighted and with the Court's findings set forth.

| Expense Categories | Per Clavell | Per DOE | Findings |
|---|---|---|---|
| **Rent** | **($956.00)** | **($600.00)** | **($956.00)** |
| Utilities (electric, heat, gas, water) | ($165.00) | ($165.00) | ($165.00) |
| Cell Phone, Internet, Cable | ($239.00) | ($239.00) | ($239.00) |
| **Food & Housekeeping Supplies** | **($400.00)** | **($256.00)** | **($590.00)** |
| **Childcare** | **($50.00)** | **$0** | **$0** |
| Clothing, Laundry, Dry Cleaning, Personal Care | ($65.00) | ($65.00) | ($65.00) |
| **Medical & Dental** | **($420.00)** | **($67.00)** | **($190.00)** |
| **Transportation** | **($400.00)** | **($160.00)** | **($160.00)** |
| Entertainment & Recreation | ($40.00) | ($40.00) | ($40.00) |
| Car Insurance & Payments | ($565.00) | ($565.00) | ($565.00) |
| **Miscellaneous** | **-** | **-** | **($100.00)** |
| Total Expenses | ($3,300.00) | ($2,157.00) | ($3,070.00) |

**Rent and Utilities**.  The DOE contends that in prior deposition testimony Mr. Clavell stated that his actual rental payments to his grandfather had been approximately $400 to $600 per month.  *See* Def.'s Post-Trial Br. 14 [ECF No. 37].  At trial, however, Mr. Clavell testified credibly that his agreement with his grandfather (who struggles to pay his own medical costs) requires Mr. Clavell to bear the entire mortgage payment of $956.  Mr. Clavell also testified that he remains liable, to his grandfather, for any underpayments of rent, and that part of the one-time early pension distribution that Mr. Clavell received in 2018 was used to pay such arrears.

There may have been times when Mr. Clavell failed to make the full rent payments that he was required to make to his grandfather, but that does not support the DOE's contention that Mr. Clavell's "real" rent obligation is less than $956 per month.  Mr. Clavell's grandfather is already supporting Mr. Clavell in the form of housing at below-market rent.  The suggestion that Mr. Clavell should reduce these low expenses even further by reneging on his agreement with his grandfather, thereby forcing his grandfather involuntarily to provide additional financial support, is not reasonable.

22

The DOE does not contest the stated expenses for utilities, telephone, cable and internet. The total monthly expenses for rent ($956), for utilities ($165) and cable, telephone and internet ($239), are far lower than the average of such costs for a family of 1 ($2,246) or for a family of 2 ($2,638) in Bronx County. *See* Pl.'s Ex. C. Mr. Clavell's total housing and utilities budget is also significantly below the IRS guideline figure that is used in calculating the "disposable income" of a chapter 13 debtor in Bronx County, which is $1,578 for one person and $1,853 for two people. U.S. Dep't of Justice, *Bankruptcy Allowable Living Expenses (Cases Filed Between May 15, 2015 and October 31, 2015, Inclusive), Local Housing and Utilities Standards\**, https://www.justice.gov/ust/eo/bapcpa/20150515/bci_data/housing_charts/irs_housing_charts_NY.htm (last visited Feb. 3, 2020). I find that the asserted rent expense of $956 per month, and the agreed utility expenses, are well-supported by the evidence, that they plainly reflect a successful effort to economize, and that they are reasonable expenses necessary to the maintenance of a minimal standard of living.

**Food and Housekeeping**. Mr. Clavell proposed a $400 monthly budget for food and housekeeping expenses. The DOE argues that Mr. Clavell's monthly food costs should instead fall between the "thrifty" and the "low-cost" food budgets set forth by the U.S. Department of Agriculture for an adult male plus half of the budget for a child the age of Mr. Clavell's son. The DOE calculates that this would result in a food budget that ranges from $256 per month (for the "thrifty" plan) to $338 per month (for the "low cost" plan). *See* Def.'s Ex. W.

A review of the evidence, however, shows that there are many problems not only with the DOE calculations but also with the budget suggested by Mr. Clavell.

First, the DOE's exhibit states that the per-person costs that are listed for both the "thrifty" and "low-cost" food plans are based on the assumption that individuals are part of 4-

person families.  Footnote 3 to the exhibit states that for individuals in other family groups the listed figures should be adjusted, with a 20% upward adjustment recommended for a one-person family and a 10% upward adjustment for each individual in a two-person family.  DOE has proposed a one-half allowance for Mr. Clavell's son (reflecting the fact that Mr. Clavell does not have full custody) and therefore essentially treats Mr. Clavell's family as a 1.5 person family.  Based on DOE's own evidence, however, that requires an upward adjustment of the "thrifty" and "low cost" food budgets by 15%.  That would mean that the actual "thrifty" UDSA food budget for Mr. Clavell and his son would be $294.57 per month, and that the actual USDA "low cost" food budget would be $388.82 per month.

Second, the DOE calculation is based on national averages.  Some upward adjustment must be made to provide a reasonable food budget for people who live in the higher-cost New York metropolitan area.

Third, the DOE calculations take account of food expenses alone.  However, Mr. Clavell is seeking a reasonable allowance for *both* food *and* housekeeping supplies.  Both are necessary to the maintenance of a minimal standard of living, and an appropriate budget must cover both.

Fourth – and most importantly – the "thrifty" and "low-cost" food budgets cited by the USDA are not estimates of the amounts that the average reasonable person actually spends on food, or of the reasonable costs of the foods that the average person actually eats.

The so-called "thrifty" food budget is used in calculating food stamp allotments. Carlson, A., Lino, M., Juan, W-Y., Hanson, K., & Basiotis, P.P., U.S. Dep't of Agric., Center for Nutrition Policy and Promotion, *Thrifty Food Plan, 2006* abstract (2007), *available at* https://www.fns.usda.gov/cnpp/usda-food-plans-cost-food-reports.  The "thrifty" food budget is updated from time to time, using as a "primary constraint" the rule that the budget "should cost

no more than the previous [thrifty food budget] market baskets, adjusted for inflation." *Id.* at 18-

19.  The budgetary aim is not so much to reflect what the average person eats (or would like to

eat) as it is to ensure that "the cost level of the [thrifty food budget] should remain constant."  *Id.*

Accordingly, the USDA uses a mathematical model that calculates whether it is possible

to buy an array of foods that will fit within budget constraints and still satisfy nutritional

requirements.  Both the "thrifty" and "low-cost" food budgets presume that all meals are

prepared and consumed at home, with minimal (or no) use of packaged foods, no dining out and

no purchases of prepared take-out foods.  *See id.* at abstract, ES-1; Carlson, A., Lino, M., &

Fungwe, T. U.S.Dep't of Agric., Center for Nutrition Policy and Promotion, *The Low-Cost,*

*Moderate-Cost, and Liberal Food Plans, 2007* abstract, ES-1 (2007), *available at*

https://www.fns.usda.gov/cnpp/usda-food-plans-cost-food-reports.[2]

The USDA "thrifty" food budgets have been criticized on the grounds (among other

things) that they:  (1) include impractical lists of foods, (2) lack the variety called for in other

dietary guidelines, (3) make unrealistic assumptions about the facilities and time available for

food preparation, (4) make unrealistic assumptions about food availability, (5) make unrealistic

assumptions about food costs, (6) make unrealistic assumptions about food waste, and (7) ignore

variations in costs from one part of the country to another.  *See, e.g.,* Heather Hartline-Grafton

and James Weill, Food Research and Action Center, *Replacing the Thrifty Food Plan in Order*

*To Provide Adequate Allotments for SNAP Beneficiaries* 2-8 (2012), *available at*

https://frac.org/wp-content/uploads/thrifty_food_plan_2012.pdf, and sources cited therein.  The

---

[2]    Both food budgets rely on pricing data from the Federal Government's 2001-2002 Food
Prices Database, which reflects the pricing of food prepared at home and includes
convenience products available at the grocery store.  *Food Prices Database, 2001-02*, U.S.
Dept't of Agric. (Apr. 1, 2014), https://www.fns.usda.gov/food-prices-database-2001-02.
The database excludes the price of hot food and food purchased in restaurants.  *Id.*

budget relies on mathematical calculations of portion sizes that do not neatly or easily correspond to items that may actually be available in markets. *Id.* at 3 (noting that the weekly market basket for a reference family of four assumes approximately 0.64 ounces of "frozen or refrigerated entrees" and approximately 2.1 ounces of "all cheese," which is the equivalent of "about two-thirds of a fish stick and two slices of cheese for a family of four for a week.") The "thrifty" food budget is essentially a calculation of the bare minimum that someone with (i) large amounts of available time, (ii) exceptional measuring, calculation and storage skills, and (iii) highly skilled culinary abilities would need to spend in order to eke out a subsistence living. Even then it is dubious that the budget is really sufficient. *Id*. at 2-8.

The task before me is to determine whether the repayment of Mr. Clavell's student loans would impose an "undue hardship." It is clear from the case law (as stated above) that a debtor is entitled to maintain a "minimal standard of living" and is not required to live in poverty. If the "undue hardship" standard does not require a borrower to live in poverty, then it does not make sense to condemn Mr. Clavell and his son to abide by a poverty-level food budget, which is what the use of the unrealistic "thrifty" food budget would do.

The "low-cost" food budget also presumes that all meals are prepared at home, with limited use of packaged foods, no dining out and no purchases of prepared take-out foods. As with the "thrifty" food budget, the low-cost food budget presumes an extreme mastery and efficiency in shopping, food selection, portion measurement, food preparation and food storage. How a busy working father with a special-needs son could reasonably be expected to conform to those expectations over a sustained period is beyond me.

The Internal Revenue Service also publishes guidelines for allowable food expenses, and these represent the official standards that are used by the Office of the United States Trustee in

calculating the "disposable income" of a debtor in a bankruptcy case.  The figures are derived

from the Bureau of Labor Statistics Consumer Expenditure Survey and they are available on the

United States Trustee's website.[3]  The current standards permit a food allowance of $386 per

month for one person, and a housekeeping allowance of $40 per month, which in total exceed the

amounts that Mr. Clavell has budgeted for food and housekeeping supplies.  If one were to use

the mid-points between the listed figures for a family of one and a family of two (reflecting the

fact that Mr. Clavell cares for his son approximately 50% of the time), then these guidelines

suggest that a proper food budget would be $535.50 per month and a proper budget for

housekeeping supplies would be $56 per month, for a total of $591.50 per month.

The IRS figures are far more reasonable than the budgets that the parties proposed.  This

is true not only of the DOE's proposed budget, but also of Mr. Clavell's proposed budget.  I am

very reluctant to *increase* a debtor's suggested budget in calculating the debtor's resources, but

in this instance it is quite clear to me, and I so find, that Mr. Clavell has greatly understated his

actual food and housekeeping costs.  The credit card statements he has submitted into evidence

make clear that his restaurant and take-out purchases push his actual food expenditures well

above the $400 he has budgeted.  While Mr. Clavell does need to economize by reducing his

restaurant expenditures as much as he reasonably can, his proposed $400 food budget

significantly understates the amount that a minimal standard of living requires.  In setting a

reasonable budgetary target, the IRS figures (not the figures proposed by the DOE, and not the

unrealistic estimate submitted by Mr. Clavell himself), supplemented by my own common sense

and experience, are the reasonable and appropriate figures to use.  *See, e.g.*, *Zook*, 2009 WL

512436, at *5–*7, *9 (finding that debtor lacked the ability to maintain a minimal standard of

---

[3]    *See* https://www.justice.gov/ust/means-testing/20190501 for a link to the current standards.

living, in part, by considering medical, automobile, and miscellaneous emergency expenses omitted from the debtor's budget); "[f]urthermore, as a court examines a debtor's expense budget as a whole, it is appropriate for a court to take into account reasonably necessary items that are omitted, thereby creating, in the words of the bankruptcy court, 'an austere and even understated expense budget'"; *McLaney*, 375 B.R. at 675.

The DOE criticizes the fact that Mr. Clavell's estimated food budgets have changed over time. In his November 9, 2017 answers to interrogatories Mr. Clavell estimated that his food and housekeeping supplies cost $125 per month. In supplementary answers dated April 11, 2019, he estimated that these items cost $300 per month. During the trial (as noted above) he estimated that a $400 monthly budget was more accurate. I have carefully considered the evidence on this point. I do not believe that the upward changes in the budget are a product of gamesmanship, as DOE contends. Most people do not have a strong sense of what they spend on things, and it is abundantly clear to me from the evidence that in some areas Mr. Clavell does not have a realistic sense of what his expenditures actually are or what they reasonably should be. For example, nobody could or should have thought that Mr. Clavell's initial proposed budget for food and housekeeping expenses ($125 per month, or just over $4 per day) could possibly have fully reflected his necessary food and housekeeping expenses. The changes to Mr. Clavell's estimates of food and housekeeping expenses have reflected an honest effort by Mr. Clavell to correct items for which his prior estimates were woefully and obviously too small, and I find that in the end he still understated the actual and reasonable costs.

I therefore conclude that $590 per month is a reasonable budget for food and housekeeping expenses. Adhering to that budget will reflect an effort to economize, and the budgeted amount is reasonable and necessary to the maintenance of a minimal standard of living.

**Childcare Costs**.  The DOE also takes issue with babysitting fees totaling $50 monthly that Mr. Clavell testified about at trial and that he included in the budget in his post-trial submission.  This item was not listed as a claimed expense when the Joint Pretrial Order was prepared and entered.  However, Mr. Clavell testified credibly at trial that on occasion he needs to pay for a sitter on days when he has custody of his son but is not able to care for his son personally.  That is at least partially because his son's grandparents on his mother's side are themselves unwell and cannot be relied upon as caretakers.  The DOE cannot credibly dispute that there may be occasions on which a single caretaker of a child must incur childcare expenses because he or she cannot always be in the child's presence.  It would have been better if Mr. Clavell had identified them at an earlier stage, but I do not believe that the belated identification of this relatively small expense was prejudicial to the DOE or that the evidence should be disregarded.

On the other hand, this is an irregular expense.  Irregular expenses are better accounted for by making a general allowance for "miscellaneous" items, as explained further below.  For that reason the Court has not approved a separate allowance for childcare costs.

**Transportation Costs**.  Mr. Clavell stated in his November 9, 2017 interrogatory answers that his monthly transportation expenses (for gasoline and occasional train travel) were $160, and he used that same figure when he submitted supplementary interrogatory answers on April 11, 2019.  At trial, Mr. Clavell similarly estimated his monthly transportation costs are approximately $160 because his estimate of weekly transportation costs was $40.  Trial Tr. 62:11-16.  Specifically, he explained that the $160 reflected his estimate for gas money and the occasional train fare for instances during which he has to commute to different parts of Manhattan for work.  *Id.*

In the post-trial submissions, however, Mr. Clavell's counsel has sought to increase this budgeted monthly expense to $400. There is nothing in the evidentiary record that supports or explains this upward adjustment. I find that $160 figure urged by the DOE reflects the most accurate estimate based on the evidence at trial.

**Medical Expenses**. In his April 11, 2019 supplementary interrogatory answers Mr. Clavell estimated his out-of-pocket medical expenses to be $50 per month. In his post-trial submission, however, Mr. Clavell has sought to raise the budgeted amount for medical expenses to $420 per month. In part this change is based on counsel's contention that Mr. Clavell likely will need to make regular visits to an eye doctor to treat a serious eye condition.

Mr. Clavell did testify at trial about his eye condition and about his lifetime need for prescription eye drops. *Id.* at 61:16 – 62:6. The newly-identified eye doctor expenses, however, simply arose too late and without sufficient evidentiary support to permit the Court to validate them or to include them in a reasonable budget. It seems entirely possible that Mr. Clavell will have such expenses in light of his eye problems, and if other evidence supporting Mr. Clavell's testimony about them had been offered at trial the Court likely would have looked on that evidence favorably. However, no such evidence was offered. Individual debtors are often not particularly adept at budgeting, and so a court may offer some leeway for missed or changed estimates given the challenge that identifying each and every likely regular expense may pose. Here, however, Mr. Clavell repeatedly failed to identify the likely expense of regular eye doctor expenses despite the many opportunities he had to update and finalize his expected budget.

The DOE argues that if Mr. Clavell had previously claimed a monthly medical expense of $420 and had previously identified eye doctor visits as a necessary expense, then it would have conducted additional discovery to examine that contention more closely and potentially

subject it to cross-examination.  There may be some expense items about which Mr. Clavell testified that did not prejudice the DOE (such as his eye drop expenses or his revised estimate of out-of-pocket food and housekeeping expenses), but in this case a fair evaluation of the proposed ongoing medical expenses entitled the DOE to discovery that the DOE had no chance to conduct.

In addition, the Court notes that the new evidence Mr. Clavell proposes to offer (which appears to be screenshots from a United Healthcare smartphone app) has not been authenticated. Even if I were to accept the evidence as authentic, it is unclear to what extent Mr. Clavell himself, rather than his insurance company, was responsible for the payments that were identified.

I therefore grant the DOE's motion to strike the new exhibits as to Mr. Clavell's likely future eye doctor expenses.  *See* DOE's Mot. to Strike 2 [ECF No. 40].  Even absent these exhibits, however, the trial record shows that Mr. Clavell's likely out-of-pocket medical-related expenses for himself and his son are well above the $67 estimate urged by the DOE.

Mr. Clavell testified credibly that he typically provides his son's mother at least $100 per month for his son's asthma medication, which costs in total $180 per month out-of-pocket.  He also testified that he has often forgone his own eye drop treatments because of tight resources. This testimony was credible, and the $70 per month budgeted for the medicine is reasonable and necessary.  Mr. Clavell may have unwisely neglected his necessary eye drop treatments in the past, but that hardly means that in forecasting a reasonable budget one should compel Mr. Clavell to do so in the future.  *Brunner's* first prong does not require that the debtor "[forego] necessary medical . . . care and continue to suffer from medical conditions that require ongoing treatment or medication" to repay his loans.  *See Educ. Credit Mgmt. Corp. v. Smith*, No. CIV.A. H-11-57, 2011 WL 4625397, at *6 (S.D. Tex. Sept. 30, 2011).

The DOE has argued that Mr. Clavell's medical expenses should be offset by sums available in a health savings account ("HSA"), but the evidence did not show that Mr. Clavell has such an account, and he testified that he never elected that benefit. Mr. Clavell pays for medical insurance which should cover doctor visits, but some provision in his medical expense budget should be made for likely deductible payments.

I find on the basis of the evidence at trial that a reasonable and necessary monthly budget for out-of-pocket medical expenses for Mr. Clavell and his son is $190.

**Miscellaneous Items**. I note that the United States Trustee Guidelines provide a $170 per month allowance for "miscellaneous" items that do not fall into other expense categories. Not all expenses can be predicted with regularity; it is an ordinary part of life that repairs may be needed or that unexpected expenses must be incurred. The occasional babysitting expenses that Mr. Clavell identified fall into this category. I have therefore included in the expense estimates an allowance of $100 per month for "miscellaneous" expenses that are necessary to the maintenance of a minimal standard of living but that may not occur with regularity.

### C.    Conclusions as to Mr. Clavell's Ability to Make Loan Payments

I find that Mr. Clavell's available net income, after expenses that are necessary to the maintenance of a minimal standard of living for himself and his son, is currently $172.02 (for so long as his 401(k) loan repayments continue) and will increase to $255.73 once the repayment of Mr. Clavell's 401(k) loan is completed in April 2020. The projected available amount ($255.73) is less than the $492 monthly payment that would be required under the REPAYE program, which itself is the lowest of the available monthly payment options.

I find that Mr. Clavell has made efforts to economize. The evidence and testimony suggest that he has stayed, for most of his life, in the same home he grew up in to save on rent,

and that he currently pays rent that is far below market.  He has foregone necessary medical

treatment, and he limits his minimal recreation and entertainment expenses to occasional

activities intended to benefit his son.  I therefore conclude that if he is required to repay his

student loans in full, Mr. Clavell will be unable to maintain a minimal standard of living for

himself and for his son.

## II.    Additional Circumstances Suggesting a Continuing Inability to Repay

Courts have also applied different standards in deciding whether an inability to repay

loans is likely to persist.  Some courts have taken the view that debtors must show a "certainty of

hopelessness" or a "total incapacity" to obtain a discharge.  *See, e.g.*, *O'Hearn v. Educ. Credit

Mgmt. Corp. (In re O'Hearn)*, 339 F.3d 559, 564 (7th Cir. 2003) (requiring a showing of a

certainty of hopelessness); *Pa. Higher Educ. Assistance Agency v. Faish (In Re Faish)*, 72 F.3d

298, 307 (3d Cir. 1995) (requiring a showing of total incapacity).  I do not agree with those

decisions.  The statute requires only a showing that a failure to discharge student debts would

impose an "undue hardship."  The "certainty of hopelessness" standard, by contrast, effectively

means that a discharge must be denied if there is any possibility that a debtor's prospects might

improve in the future – even if that is not likely to be the case, and even if the evidence shows

that a debtor is likely to suffer extreme burdens while waiting to see if a magical improvement in

his or her prospects happens to materialize.  I do not believe that the words "undue hardship" can

fairly be interpreted as supporting such a standard.

When a statute requires us to make a judgment about the future we should do so based on

what is likely to happen, as shown by the evidence before us.  If there is a good chance that the

debtor's career prospects actually will improve, then certainly that must be taken into account in

applying the second factor of the *Brunner* test.  But mere possibilities or unlikely prospects

should not be enough.  If we deny discharges to debtors who are not likely to be able to repay

their student loans – just because we cannot exclude the chance that the debtors' prospects could

improve – then we will be condemning most of those debtors to endure "undue hardship" rather

than relieving them from it.  That result is the opposite of what the statute demands.

I note that the *Brunner* decision itself did not impose a "certainty of hopelessness"

standard.  Instead, *Brunner* requires that a debtor show circumstances that are "strongly

suggestive" of a "continuing inability to repay over an extended period of time."  *Brunner*, 831

F.2d at 396; *see also Rosenberg*, 2020 Bankr. LEXIS 73, at *11-12 (holding that *Brunner* does

not require a debtor to prove its current state of affairs "are going to persist forever" and only

requires proof that the current state of affairs is "likely" to persist for "a significant portion" of

the repayment period); *Kopf v. U.S. Dep't of Educ. (In re Kopf)*, 245 B.R. 731, 744 (Bankr. D.

Me. 2000) ("To conclude that the debtor must demonstrate something approaching 'certainty of

hopelessness' or 'total incapacity' would be to sacrifice the notion of 'fresh start' at the altar of

'undue hardship'"); *Doherty v. United Student Aid Funds, Inc. (In re Doherty)*, 219 B.R. 665,

671 (Bankr. W.D.N.Y. 1998) (rejecting the notion that *Brunner* commands a showing of "a

certainty of hopelessness" given that "the Second Circuit's concern was with *abuse* by student

debtors" and holding that the second prong of the *Brunner* test requires only that it is "likely"

that the debtor will be unable to improve his current financial circumstances).

For the same reasons I agree with the view that the "additional circumstances" element of

*Brunner's* second prong only requires the presence of "any circumstances, beyond the mere

current inability to pay, that show that the inability to pay is likely to persist for a significant

portion of the repayment period," rather than "exceptional circumstances" such as "serious

illness, psychiatric problems, [or] disability of a dependent." *See Nys v. Educ. Credit Mgmt.*

*Corp. (In re Nys)*, 308 B.R. 436, 444 (B.A.P. 9th Cir. 2004), *aff'd*, 446 F.3d 938 (9th Cir. 2006).

In this case, the evidence shows that Mr. Clavell's present inability to repay his student

loans while maintaining a minimal standard of living for himself and his son is a circumstance

that is likely to continue for a significant portion of the repayment period. The DOE contends

that Mr. Clavell has received prior salary increases and is likely to receive salary increases in the

future, but that contention overlooks the fact that his employer has changed and he no longer

appears to receive the incentive bonuses he previously did. Moreover, his extensive job

searches in the fields most pertinent to his field of study have been futile, and I do not believe

that any such future searches will fare better. There is no suggestion that Mr. Clavell is pursuing

a lower-paying job than he should have taken, or that there is any realistic prospect that his salary

will increase other than in a way that would keep pace with the likely inflationary increase in his

expenses over time.

If anything, the evidence at trial suggests that Mr. Clavell's budget is likely to get tighter

over time. I am skeptical, for reasons stated above, whether the budget that I have calculated

(based on the evidence) really covers all of Mr. Clavell's actual costs. His son has

developmental delays and there appears a strong likelihood that he will require additional special

services beyond what the New York City Department of Education is currently providing free of

charge. The special needs of his son—who is now only 6 and will therefore depend on Mr.

Clavell for at least another 12 years until he reaches the age of majority—when coupled with the

dubious likelihood that Mr. Clavell will receive material pay increases in the future, constitute

"additional circumstances" showing Mr. Clavell's inability to repay his loans is likely to

continue for a significant part of the repayment period. *See Lebovits v. Chase Manhattan Bank*

*(In re Lebovits)*, 223 B.R. 265, 274 (Bankr. E.D.N.Y. 1998) ("It is reasonable to infer that the

Debtor's expenses attributable to his children will likely extend or even increase for a significant

portion of the repayment period."); *see also Windland v. U.S. Dep't of Educ. (In re Windland)*,

201 B.R. 178, 183 (Bankr. N.D. Ohio 1996) (daughter's severe asthma contributed to court's

finding that debtor's poor financial circumstances would likely persist).

"Debtors must prove by a preponderance of the evidence that, for a substantial portion of

the loan repayment period, they would not be able to maintain even a 'minimal' standard of

living if forced to pay that debt." *Carnduff v U.S. Dep't of Educ. (In re Carnduff)*, 367 B.R. 120,

129 (B.A.P. 9th Cir. 2007). Mr. Clavell has met this burden.

## III.   Mr. Clavell's Good Faith

The third *Brunner* factor requires a showing "that the debtor has made good faith efforts

to repay the loans." *Brunner*, 831 F.2d at 396. "This prong of the analysis recognizes that undue

hardship 'encompasses a notion that the debtor may not willfully or negligently cause his own

default, but rather his condition must result from factors beyond his reasonable control.'"

*Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner)*, 309 B.R. 405, 420 (Bankr. E.D.N.Y. 2004)

(internal quotation marks omitted) (quoting *Elmore v. Ma. Higher Educ. Assistance Corp. (In re

Elmore)*, 230 B.R. 22, 27 (Bankr. D. Conn. 1999).

The DOE argues that in the years since the consolidation of his student loan debts Mr.

Clavell has not made any payments, and it contends that this should preclude a finding that Mr.

Clavell has made good faith repayment efforts. But a debtor's "good faith" must be determined

based on the situation in which the debtor found himself. A failure to make payments that a

debtor could and should have made may be a sign of bad faith. But in this case the loan servicers

themselves recognized that Mr. Clavell's circumstances did not permit him to make payments,

36

and they suspended Mr. Clavell's payment obligations and put the loans in forbearance as a

result.  In fact, Mr. Clavell has never defaulted on his student loans.  Instead, his payment

obligations have been suspended.  Mr. Clavell's failure to make payments was hardly a sign of

"bad faith" when the lender acknowledged that Mr. Clavell could not make such payments and

when the lender agreed to suspend his obligation to make them.  *See Norasteh v. U.S. Dep't of

Educ. (In re Norasteh)*, 311 B.R. 671, 677 (Bankr. S.D.N.Y. 2004) (noting that decision to put

loans into forbearance "reflected the [DOE's] decision that the debtor was unable and would be

unable to pay the loan during the particular grace period" and that the DOE therefore was "hard-

pressed to argue that the debtor nevertheless acted in bad faith" by failing to make payments.)

Good faith properly is "measured by a debtor's efforts to obtain employment, maximize

income and minimize expenses, and to undertake all other reasonable efforts to insure

repayment." *Educ. Credit Mgmt. Corp. v. Curiston*, 351 B.R. 22, 33 (D. Conn. 2006) (citing

*Elmore v. Mass. Higher Educ. Assistance Corp.*, 230 B.R. 22, 27 (Bankr. D. Conn.1999)); *see

also Educ. Credit Mgmt. Corp. v. Polleys,* 356 F.3d 1302, 1311 (10th Cir. 2004) (finding that

"the failure to make a payment, standing alone, does not establish a lack of good faith.")  The

evidence shows that Mr. Clavell did his best to maximize his employment opportunities and his

income and to minimize his expenses.  He attempted to find a position in law enforcement but

was unable to do so despite diligent efforts.  He has worked in a sales position and, as noted

above, there is no suggestion that he passed up any better opportunities that were available.  He

has minimized rent expenses by living with relatives.  He has a large child support obligation

that he must honor and other reasonable expenses that do not permit him both to maintain a

minimal standard of living and to repay his student loans.  The evidence quite clearly

demonstrates that circumstances beyond Mr. Clavell's reasonable control have caused his economic difficulties and have defied his genuine endeavors to achieve financial stability.

In addition, Mr. Clavell did not default on his obligations and idly wait for the DOE to initiate collections activity.  He instead immediately contacted his loan servicing agent once his son was born and continued to keep the servicer apprised of the developments in his personal finances.  The bankruptcy filing reflected a good faith conclusion that he simply could not afford to repay his accumulated debts, and this adversary proceeding was prompted by a good faith belief that he could not repay his student loan debts without suffering undue hardship.

I conclude that Mr. Clavell has established that he made good faith efforts to repay his student loans.

### Partial Discharge

Mr. Clavell asked that his student loans be discharged either in whole or in part.  The Bankruptcy Code does not explicitly provide for a so-called "partial discharge," but some courts have held that the discharge powers under section 523(a)(8) permit a court to discharge a portion of a debtor's student loans, and do not confine courts to making decisions on an "all-or-nothing" basis.  *See Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168, 1175 (9th Cir. 2003) ("[B]efore the bankruptcy court can partially discharge student debt pursuant to § 105(a), it must first find that the portion being discharged satisfies the requirements under § 523(a)(8)."); *DeMatteis v. Case W. Reserve Univ. (In re DeMatteis)*, 97 F. App'x 6, 11  (6th Cir. 2004) (affirming bankruptcy court decision regarding the availability of partial discharge); *Alderete v. Educ. Credit Mgmt. Corp (In re Alderete)*, 412 F.3d 1200, 1207 (10th Cir. 2005) (holding that a partial discharge requires a finding of an undue hardship).  There is no binding or definitive authority on this issue in the Second Circuit.

As noted above, the Court directed the parties to make clear statements as to whether they believe that a partial discharge may be granted, and both parties agreed that the Court has the power to grant a partial discharge if the *Brunner* factors are satisfied as to the portion of the obligation that is to be discharged.  Given the agreement of the parties on this issue I will presume, without deciding, that I do have the power to grant a partial discharge.

I conclude from the evidence that all of the accrued interest, and a portion of the outstanding principal of Mr. Clavell's student loans, should be discharged, such that his remaining principal is reduced to whatever amount would require a monthly payment of $250 under a "standard" 25-year repayment plan.  A monthly payment of $250 will leave Mr. Clavell with monthly obligations for rent, child support, car payments, student loan payments and other expenses that in the aggregate are high in relation to his income, and will leave him well short of the "fresh start" that other debtors obtain.  However, I believe this outcome is what the governing standards and the evidence before me require.

The parties are directed to consult with each other and to agree on the amount to which the principal needs to be reduced to generate the $250 monthly payment specified above and to notify the Court of their agreement on or before February 21, 2020.  If the parties cannot agree the Court will schedule such further proceedings as may be needed to resolve the question.

A separate order will be entered to reflect the foregoing rulings.

Dated: New York, New York
        February 7, 2020

**s/Michael E. Wiles**
Hon. Michael E. Wiles
United States Bankruptcy Judge